**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SAMS HOTEL GROUP, LLC, d/b/a | ) | |
| HOMEWOOD SUITES HOTEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-00930-TWP-TAB |
| | ) | |
| ENVIRONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED DECISION AND ORDER FOLLOWING BENCH TRIAL**

A bench trial commenced in this case on July 11, 2011 and concluded on July 13, 2011.

Plaintiff, SAMS Hotel Group, LLC, d/b/a Homewood Suites Hotel ("SAMS"), filed an action

against Defendant, Environs, Inc. ("Environs"), asserting a claim for a breach of contract.  The

Court hereby renders its final decision regarding the matters presented at trial.  This Entry shall

constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of

Civil Procedure 52.[1]

## I.  FINDINGS OF FACT

**A.    The Parties and the Homewood Suites Hotel Project**

SAMS is a limited liability company organized and existing under the laws of the State of

Indiana with its principal place of business in Indiana.  (Dkt. 1-1 at 3; Compl. ¶ 1.)  Environs is

an Illinois corporation with its principal place of business in Maryville, Illinois.[2]  (Dkt. 1-1 at

3; Compl. ¶ 2.)  SAMS owned the rights to build a Homewood Suites Hotel in Fort Wayne,

---

[1] Any finding of fact that is more properly considered a conclusion of law is adopted as such and vice versa. In addition, the Court recognizes that there was conflicting testimony on some of the issues presented at trial and discussed herein. The Court has considered all of the evidence presented by the parties and the credibility of all of the witnesses in arriving at its findings of fact.

[2] SAMS initially filed this lawsuit in state court against three defendants: Environs, Nucon Steel, and DSI Engineering. Defendants removed this lawsuit to this Court, and the parties subsequently stipulated the dismissal of Nucon Steel and DSI Engineering, leaving Environs as the only remaining defendant. *See* Dkt. 141 at 2.

Indiana.  (Tr. 137:11-14.)  In March 2007, SAMS hired Environs as its architectural design

firm (Dkt. 1-1 at 3; Compl. ¶ 2) to build a multi-story Homewood Suites Hotel ("the Hotel")

in Fort Wayne, Indiana.

Ash Lakhany ("Lakhany") is the president of Super Host Hospitality, a corporation which

manages several corporate entities, including SAMS.  (Tr. 134:15-135:2.)  Lakhany is also the

president and managing member of SAMS.  (Tr. 135:16-17.)  Michael Sapp ("Sapp"), a licensed

architect, is the sole officer and president of Environs.  (Ex. 148 at 11:6-11.)  Sapp received his

Bachelor of Fine Arts in architectural studies from the University of Illinois-Champaign in 1979.

(Tr. 557:7-12.)  While studying at the University of Illinois, Sapp also took a variety of structural

engineering courses.  (Tr. 557:13-558:11.)  After graduating, Sapp worked as a licensed architect

as well as a structural engineer on several construction projects, but he is not a licensed,

professional engineer.[3]  (Tr. 665:23-666:15.)

The design of the Hotel involved preparing plans and specifications for a six story, steel

frame building located in Fort Wayne, Indiana.  (Tr. 142:21-23.)  In addition to the six story

main structure, the Hotel would also contain a penthouse.  (*Id.*)  According to the project manual,

the entire hotel structure with the penthouse suite would be approximately 66,787 square feet.

(Ex. 6 at 1010-1.)

**B.**     **Environs' Contractual Agreements with SAMS**

In January 2007, Sapp was contacted by Dick Lehman, a representation of Lakhany, with

a proposal to construct the Hotel.  (Tr. 577:1-8.)  On February 22, 2007, Environs sent SAMS a

proposed agreement ("the Contract") setting forth the architectural services to be provided by

Environs relating to the construction of the Hotel.  (Ex. 1.)  The Contract, executed by Lakhany

---

[3] At trial, Sapp testified that Environs has served as the design professional on over 350 hotels (Tr. 563:14-16) and of the 350 hotels in which Environs served as the design professional, Environs served as the structural engineer for approximately 80% of the projects.  (*Id.* at 17-18.)

and Sapp on behalf of the respective companies on March 1, 2007, became the final agreement between SAMS and Environs regarding the design of the Hotel.  (*Id.* at 5.)  Pursuant to the Contract, Environs agreed to provide SAMS with "professional services required for the design" of the Hotel, which included, among other responsibilities, "architectural and engineering services" through a four phase process.  (*Id.* at 1.)  However, according to the Contract, "basic architectural services…do not include specific system design of all mechanical, electrical, plumbing systems or specific structural engineering services (i.e., pre-engineered truss design, sprinkler system design, etc…)."[4]  (*Id.* at 4.)

The four phases outlined under the Contract included: (1) a design phase; (2) a construction document phase; (3) a bidding phase; and (4) a construction administration phase.  (*Id.* at 1-3.)  During the design phase, Environs agreed to supply SAMS with "schematic design drawings and documents of the proposed layout" from which "a final design will be developed to meet the requirements of authorities having jurisdiction."  (*Id.* at 1.)  In the construction phase, Environs agreed to prepare construction documents consisting of drawings and specification information and included in these documents would be "structural drawings for steel framing system including design of specific structural members."  (Ex. 1 at 2.)  In the bidding phase, Environs agreed to assist SAMS with obtaining and evaluating subcontractor bids.  (*Id.*)  Finally, in the construction administration phase, Environs agreed to conduct a total of three work site visits to the Hotel and submit written reports of its findings to SAMS.  (*Id.* at 3.)

Under the Contract, Lakhany agreed to pay Environs $70,000.00 for its architectural services.  Additionally, included in the contractual agreement between SAMS and Environs

---

[4] At trial, specific structural engineering services were construed to be services involving pre-engineered systems. (Tr. 573:5-574:15.) Sapp testified that a pre-engineered system involved functional products that were typically manufactured by the manufacturer. (Tr. 574:16-575:2.)

was a limited liability provision, which would limit Environs' liability relating to its services rendered to SAMS. The limited liability provision reads as follows:

> The Owner agrees that to the fullest extent permitted by law, Environs Architect/Planners, Inc. total liability to the Owner shall not exceed the amount of the total lump sum fee due to negligence, errors, omissions, strict liability, breach of contract or breach of warranty.

(*Id.* at 4.)  Prior to the commencement of the bench trial, the parties filed cross motions for summary judgment regarding the enforceability of the limited liability provision.  Subsequently, the Court issued a ruling in its Entry on Cross Motions for Summary Judgment (Dkt. 141) finding the provision to be enforceable.  Therefore, under the terms of the Contract, the total amount of damages SAMS may recover from Environs is limited to the "total lump sum fee" of $70,000.00 paid by SAMS to Environs.[5]  (Dkt. 141 at 7.)

## C.      Environs' Design Drawings and Materials Inspection and Testing, Inc.'s Soil Testing Relating to the Hotel

In early 2007, Lakhany informed Environs that he wanted the foundational and structural design drawings fast-tracked to the Indiana Department of Homeland Security ("the State") for its approval of the project.  (Tr. 147:12-14.)  In April 2007, Environs began preparing the first set of foundational and structural design drawings for the Hotel.  (Exs. 172-174.)  During that month, Environs prepared design drawings for the Hotel, including drawings showing the walls for the three towers in the building – two stair towers and an elevator tower.  (Tr. 694:15-695:2.) Specifically, structural drawing sheet 1.1 ("S1.1") and architectural drawing sheet 4.11

---

[5] Prior to the construction of the Hotel, Lakhany, working for Super Host Enterprises, had previously contracted with Environs in 1999 to design a three story hotel called the Hilton Garden Inn Hotel in Fort Wayne, Indiana. (Tr. 568:8-15.) The 1999 Contract entered into by Environs and Lakhany was essentially the same contract signed by Lakhany in 2007. (Dkt. 69-1 at 2; Sapp's Aff. ¶ 8.) However, with respect to the Hilton Garden Inn Hotel, Environs was responsible for the architectural, structural, mechanical, electrical, and plumbing systems of the project. (Ex. 148 at 53: 6-13.) With regards to the Hotel, Environs was responsible for only the architectural and structural systems of the project because Lakhany hired a separate company to provide for the mechanical, electrical, and plumbing services. (*Id.* at 53:14-25.) As the structural engineer for the project, Sapp was responsible for the structural design of the Hilton Garden Inn. (Ex. 148 at 13:13-15.) For its architectural design services, Lakhany paid Environs $30,000.00.  (Ex. 202; Tr. 576:16-18.)

("A4.11") depicted the outlines of three concrete masonry unit towers – two interior shear wall stair towers and an elevator tower.  (Ex. 170 and Ex. 173.)  At trial, SAMS' expert witness James McClain ("McClain"), a licensed, professional engineer, testified that the foundational drawings of the three towers depicted in S1.1 were designed to be shear towers – concrete block with steel rebar reinforcement and grout.  (Tr. 484:10-485:19.)

On July 31, 2007, Environs submitted the first full set of completed, signed design drawings to the State for their review.  (Tr. 692:1-9.)  However, the submitted design drawings did not adequately provide for a lateral shear wall system that would be used to resist lateral loads.  (Tr. 702:23-703:6.)  Moreover, Sapp was aware of the fact that a lateral shear wall system designed to resist lateral loads was needed for the Hotel in some manner.[6]  (Ex. 282.)  However, Sapp believed that the lateral shear wall system for the Hotel would be designed and provided by the specialty contractor, Nucon Steel, A Nucor Company ("Nucon")[7] along with another sub-contractor, DSI Engineering, Inc. ("DSI").  (Tr. 686:2-7.)  Subsequently, in an effort to comply with Lakhany's request, Sapp submitted the first set of drawings to the State without finalizing the design of a lateral shear wall system.  (Tr. 692:24-693:1.)  As a result, the only drawings Nucon and DSI received with their proposal package were the April 2007 drawings.[8]  (Tr. 700:11-701:1.)

Environs also submitted a separate set of the foundational drawings to the State toward the end of June 2007.  (Tr. 690:10-14.)  After receiving the drawings from Environs, the State gave Environs an initial design release for the foundation on August 6, 2007 and a broader

---

[6] There is an email dated March 9, 2007 that was stipulated to at trial, which suggests that Sapp was aware of the necessity to select and design a particular wall system for the Hotel's towers that would make them resistant to lateral loads. (See Ex. 282; see also Tr. 704: 23-706:1.)

[7] In May 2007, Environs proposed to SAMS to hire Nucon for the Hotel project as the supplier of structural steel.

[8] In October 2007, Nucon finalized its contract with Condor Concepts, the general contractor at that time, to supply SAMS with steel beams and certain structural engineering services with the assistance of subcontractor, DSI.

release for the structural and architectural designs on August 30, 2007.[9]   (Ex. 3-5.)

Subsequently, Environs resubmitted modified structural and architectural designs to the State on

September 6, 2007, which addressed comments on Environs' design drawings given by the State.

(*Id.*)

Also, in 2007, SAMS hired Materials Inspection and Testing, Inc. ("MIT") to conduct

geotechnical exploration and subsurface evaluation of the site where the Hotel would be built.

(Tr. 755:9-14.)  The scope of MIT's soil investigation included drilling four soil borings within

the proposed building's foundational site and investigating their findings through field sampling

and laboratory testing.  (Ex. 102.)  On April 12, 2007, MIT issued a final soils report ("soils

report") to SAMS with its findings and recommendations for the design of the Hotel's

foundation.  (*Id.*)  In the soils report, MIT concluded that much of the soil at the site was soft and

would need to be removed and replaced with engineered compacted fill prior to the start of

construction.  (*Id.*)  MIT recommended the use of spread and continuous footings to be placed on

the compacted fill and the use of concrete floor slab on-grade supported by four to five inches of

compacted granular fill.[10]   (*Id.*)   Additionally, the soils report concluded that the general

contractor should remove between ten inches minimum and six feet maximum of soil and replace

it with compacted fill in light of the results from the four soil borings.  (*Id.*)

However, Environs' drawing S1.1 did not explicitly provide guidance on which specific

areas needed to be uprooted to a given depth in order to accommodate for the type of footings

recommended by MIT.  (Tr. 503:10-18.)  In other words, assuming there were different depths

associated with certain areas of the site as set forth in the soils report, S1.1 did not provide that

---

[9] A construction release from the State of Indiana notifies the architect or engineer of record that the project is ready for construction subject to any conditions imposed upon it by the release itself. (Ex. 3 and Ex. 5.)

[10] Sapp testified that spread footing allows for the transfer of weight from a point load to be spread out in a sufficient manner so that the soil below would be able to support it. (Tr. 591:5-7.)

detail.  Consequently, the amount of soil which needed to be removed and filled with compacted fill was not done.[11]  (*Id.*)

**D.     Discovery of Problems Associated with the Hotel**

In September 2007, construction began on the Hotel as it relates to pouring the footings, the concrete slabs, and the piers.  (Ex. 150.)  To assist in the construction process and management of the sub-contractors on site, SAMS hired Condor Concepts ("Condor") as the general contractor.  (Tr. 307:21-23.)  As the general contractor, Condor was obligated to take responsibility for the sub-contractors on the site as well as have control over the means, methods, and techniques involving construction pursuant to its contract.  (Tr. 306:9-14.)  Following the hiring of Condor, SAMS hired a sub-contractor to complete the excavation work as well as the concrete work on site.  (Tr. 103:18-22.)  In October 2007, following the excavation of the site, the concrete sub-contractor began to pour concrete for the footers along with the slabs and the thickened slabs.  (*Id.*)  However, at the time the sub-contractor poured the concrete for the foundation, October 16, 2007, no site representative or architectural engineer was present to inspect the foundation layout or provide testing.  (Tr. 308:6-13.)  Over the course of the next two months, the general contractor determined that some of the footings within the foundation were installed incorrectly.  (Tr. 103:5-24.)  After communicating this information to Environs, the sub-contractors in charge of pouring the concrete re-poured some thickened slabs which were initially identified as being constructed incorrectly.  (Tr. 103:25-104:7.)

On March 18, 2008, Environs conducted their first and only construction site visit pursuant to the Contract.  Sapp, for Environs, performed the construction site visit and recorded his observations, but did not issue a timely inspection report to SAMS as was required under the

---

[11] Employees of Condor discovered that the foundational drawing relating to the north side where some underground pipes were once located was inadequate. Upon informing Environs of this issue during their excavation of the site, Sapp drafted a modified foundational design incorporating a fourteen foot extended foundation. (Ex. 117.)

Contract.  (Tr. 642:19-5.)  On March 25, 2008, Scott Kammerer ("Kammerer"), the construction

liaison for SAMS, discovered cracks in the north stair tower.  (Tr. 76:12-77:1.)  While these

cracks were quickly fixed buy the general contractor, Kammerer continued to notice that the

cracks would reappear along the same path of the north stair tower.  (Tr. 77:9-16.)  In addition to

the cracks found in the north stair tower, a structural inspector with the Allen County Building

Department ("ACBD") discovered discrepancies between the design drawings and the on-going

construction at the hotel in May 2008.  (Ex. 153 at ¶ 9; Tr. 12:11-21.)  The discovery of these

troublesome issues led to a thorough inspection of the site on May 23, 2008 by officials of the

ACBD along with the inspectors from the State.  (Tr. 11:3-12:7.)

During the inspection, officials viewed cracking present on four concrete slabs, settling

on the north end of the Hotel, and cracks on the concrete masonry units of the north stair tower.

(*Id.*)  Consequently, the ACBD issued a Notice of Condemnation ("the Notice") for the Hotel.

(Ex. 143 at ¶ 9.)  The Notice was also issued due to the concern over the lack of inspections

being initiated by SAMS or the construction contractors during the pouring of the concrete, as

required under State law.  (*Id.*)  Additionally, the ACBD required SAMS to bring in a structural

engineer to investigate the problems associated with the Hotel.  (Tr. 13:9-14:6.)  In reaction to

the ACBD's recommendation, MIT and McClain were hired to lead the investigation.  (*Id.*)

Upon their review of the foundations, MIT and McClain presented their findings at a

construction meeting on July 18, 2008.  (Tr. 487:2-19.)  MIT and McClain concluded that the

three towers of the Hotel were designed improperly.  (Ex. 149.)  They discovered the towers did

not include enough shear wall support and had the incorrect type of footing.  (*Id.*)  In addition,

McClain concluded that the Hotel should have been designed using mat footings instead of wall

footings.  (*Id.*)  McClain recommended that an appropriate remedial action would include

8

demolishing the three towers and rebuilding them to be proper wind shear towers.  (Tr. 495:20-25; Ex. 149.)

Following the July 2008 inspection, members from ACBD, SAMS and Environs met on September 4 and 23, 2008 to discuss the structural deficiencies discovered on July 18, 2008 and design a remediation plan.  (Ex. 127 and Ex. 131.)  During one meeting in September 2008, Sapp made admissions to the individuals present which gave the impression that he was unprepared to take on the role of a structural engineer, specifically in regard to the design of the stair tower foundations.   (Ex. 143 at ¶ 14.)   On October 17, 2008, a survey was completed which conclusively demonstrated that at least two of the three towers were leaning out of plumb, or were off center.  (Tr. 516:8-19.)

After these meetings, between October and December 2008, ACBD, SAMS and Environs attempted to properly design a remediation plan for the Hotel.  However, each group continued to debate the proper scope of remediation needed to fix the issues plaguing the Hotel and the costs associated with the actions to remediate the site.  (Ex. 16.)  On November 21, 2008, SAMS completed and stamped remediation drawings to address the problems associated with the Hotel project.  (Exs. 211-214.)  However, SAMS never received formal confirmation on the cost for its remediation plan.[12]  (Tr. 524:25-526:12.)   Despite having a remediation plan, SAMS was not able to obtain the necessary funding to begin the proposed remediation.  (Ex. 18; Ex. 143 at ¶¶ 17-19.)  Following another walk-through by the ACBD in February 2009, the ACBD determined that the foundation of the north stair tower needed immediate attention and issued an order to demolish the Hotel to on-grade slab on February 12, 2009.  (Ex. 143 at 8.)  Subsequently, the Hotel was demolished in late March 2009 pursuant to the order issued by the ACBD.  (Ex. 142.)

---

[12] SAMS received informal estimates of the cost of remediation at a January 2009 meeting where the cost to demolish and rebuild the building was approximately $8.6 million as compared to $9.4 million to remediate the current problems and complete the project. (See Tr. 220: 17- 221:15.)

## II. CONCLUSIONS OF LAW

**A.      Preliminary Evidentiary Issues**

As an initial matter, the Court must resolve a few preliminary evidentiary issues, which the Court took under advisement during the course of the bench trial.  First, the Court initially took the admission of Exhibit 311 under advisement.  Upon review of the trial transcript, the Court properly sustained SAMS' objection to the admission of Exhibit 311 during the trial.  (Tr. 766:21-24.)  Exhibit 311 relates to a DSI wall design report.  Environs sought to admit this exhibit into evidence based on its expert witness, William Norman's ("Norman"), reliance upon it in forming his opinion.  SAMS objected arguing it was inadmissible hearsay.  An expert witness may rely upon information that would otherwise not be admissible in court in forming his opinion so long as it is the type of information on which others in the field reasonably rely upon.  Fed. R. Evid. 703.  "The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion."  *Matter of James Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992). Because Norman testified that the DSI report was not significant in rendering his opinion and the fact that the report contains hearsay, SAMS' objection is sustained.  Accordingly, Exhibit 311 is not admissible.

Second, with respect to Norman's expert testimony, the Court recognizes that there was confusion among the parties relating to the admission of Exhibit 268.  Upon further review of the trial transcript, the Court overruled SAMS' objection to the admission of Exhibit 268 and admitted Exhibit 268 over SAMS' objection.  Therefore, Exhibit 268 was admitted into evidence without qualification.

Third, pending before the Court is its ruling related to the stricken portions of Norman's testimony.  Specifically, the Court's March 15, 2011 order precluded Norman from testifying

about the design adequacy of the Hotel's design.  (Dkt. 143 at 5.)  Accordingly, the Court strikes a portion of Norman's response to a question by counsel because it relates to design adequacy.  Specifically, the Court strikes the remainder of Norman's response after he states "from the ground up, below the ground up."  (*See* Tr. 764:15-765:6.)

Lastly, pending before the Court is SAMS' objection to the deposition testimony of Amarish Patel ("Patel"), page 191, line 22, through page 192, line 9.  (Ex. 341 at 40.)  The objection is sustained because the Court finds that the statement offered by Patel is inadmissible hearsay, for which no hearsay exception applies.

## B.    Did Environs Breach the Contract?

SAMS first contends that Environs breached the Contract by not designing the Hotel's structure to adequately resist lateral loads, including wind shear, which it alleges was a substantial factor in causing the ACBD to order the demolition of the building.  Environs argues that there is no admissible evidence to establish that its architectural and structural designs drafted by Sapp amount to a breach of the Contract.  Additionally, Environs contends that even if the evidence during the bench trial demonstrated that it breached the Contract, its breach was not a substantial factor in causing SAMS' damages.  The Court disagrees.

Under Indiana law, in order for SAMS to prevail on its breach of contract claim against Environs, it must demonstrate: (1) the existence of a contract; (2) Environs' breach of that contract; (3) damages; and (4) that Environs' breach was a cause in fact of SAMS' damages. *Fowler v. Campbell*, 612 N.E.2d 596, 600-01 (Ind. Ct. App. 1993).  The plaintiff has the burden of demonstrating that the defendant's breach was a substantial factor contributing to the damages.  *Hopper v. Colonial Motel Props.,* 762 N.E.2d 181, 187 (Ind. Ct. App. 2002); *see Fowler,* 612 N.E.2d at 6022 ("The test of causation in common law contract actions is…whether the breach was a *substantial factor* in bringing about the harm.") (emphasis added).  Neither

11

party disputes the existence of a contract.   Thus, the Court must address whether there is sufficient evidence to establish that Environs' actions constituted a breach of the Contract before analyzing the issues of damages and causation.   The Court will address these issues in turn.

Environs agreed to provide SAMS with services related to four specific phases of construction:   the design phase, the construction document phase, the bidding phase, and the construction administration phase.   (Ex. 1.)   SAMS argues that Environs breached the Contract in a number of ways during particular phases of the Contract by: (1) submitting incomplete and inconsistent structural and foundational design drawings to the State and its contractors; (2) designing the Hotel in such a manner that fell below the professional standard of care; and (3) failing to inspect the construction site at the appropriate times as required by the Contract.   By contrast, Environs argues that it provided all services required of it under the Contract.   As an initial matter, the Court must first construe the terms of the written contract before determining whether Environs breached the Contract.   *See Whitaker v. Brunner,* 814 N.E.2d 288, 293 (Ind. Ct. App. 2004).

### 1.      Construing the Relevant Terms of the Contract

Under Indian law, when construing the meaning of a contract, a court must determine and give effect to the intention of the parties.   *Estate of Penzenik v. Penz Prods., Inc.*, 800 N.E.2d 1007, 1010 (Ind. Ct. App. 2003).   In construing the contract, a court must determine whether the language of the contract is ambiguous or unambiguous.   "The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts," such that "the parties' intent will be determined from the four corners of the contract."   *Id*. at 1010.   However, if "a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder."   *Id; see Whitaker,* 814 N.E.2d at 294 ("We read

the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless.  We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.");  *Gallant Ins. Co. v. Oswalt,* 762 N.E.2d 1262-63 (Ind. Ct. App. 2002) ("A contract will be found to be ambiguous only when it is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning.").

Environs contends that the Contract is clear and unambiguous as it relates to the design of the wall panels that resist lateral loads.  In particular, Environs asserts that "the contract did not require it to provide specific system design of the wall panels or to ensure that the wall panels were designed to ensure lateral wind shear" because the system is a specific structural engineering service.[13]  (Dkt. 204 at 10-11.)  While SAMS does not refute that the Contract is unambiguous, it argues that Environs is responsible for designing shear walls that resist lateral loads under the Contract as the engineer of record.  (*See* Tr. 418:2-419:7; Ex. 147.)  The relevant portions of the Contract relating to this issue are paragraph II.f. and II.g.  Paragraph II.f. states the following:

> Construction Documents shall include preparation and submittal of all correspondence, drawing specifications and data for review by franchise and authorities having jurisdiction for design of the building except civil design (site layout and design), sprinkler system design, final pool and spa design documents and landscape design.

(Ex. 1 at 2.)

Paragraph II.g. states the following:

> Construction Documents shall include structural drawings for steel framing system including design of specific structural members.

---

[13] According to the Contract, "[b]asic structural services for this project do not include specific system design of all mechanical, electrical, plumbing systems or specific structural engineering services (i.e., pre-engineered truss design, sprinkler system design, etc.) and shall not be part of this agreement." (See Ex. 1 at 4.)

(Ex. 1 at 2.)

The Court finds the above language in the Contract to be unambiguous and supports SAMS' interpretation.

First, paragraph II.f. states that Environs' construction documents include *all* correspondence, drawing specifications, and data for design of the Hotel and then lists several exceptions. Since paragraph II.f. articulated that all drawing specifications be provided and did not further include structural engineering designs among the exceptions, it is clear that Environs is responsible for this type of design. This is further supported by the incorporation of the phrase "specific structural members" in paragraph II.g., which immediately follows paragraph II.f. (*See* Ex. 1 at 2.) Reviewing the Contract as a whole yields the same result. More importantly, the contractual language discussed above still obligates Environs to ensure that a lateral shear wall system design is properly disclosed on its construction documents. The mere fact that a lateral shear wall system could be classified as a specific structural engineering service does not negate Environs' obligation to incorporate its design in its plans.

2.    **Submission of Incomplete/Inconsistent Design Drawings**

Under Indiana law, an architect who signs and affixes his seal on a set of drawings or specifications set for submission to a governmental body is responsible for that architectural work. *See* Ind. Code § 25-4-1-13 (setting forth the requirements of displaying an architect's seal on a set of drawings or specifications); IND. ADMIN. CODE 1.1-2-7(i) (articulating the responsibilities of the architect over architectural works on which they apply their seal and signature). Additionally, there is an implied agreement in every contract between an architect and his employer in which the plans and specifications prepared by the architect will be suitable for the purposes for which they were prepared. *Greenhaven Corp. v. Hutchcraft & Assocs., Inc.,* 463 N.E.2d 283, 285 (Ind. Ct. App. 1984). Finally, within such an implied agreement, an

14

architect has a duty to draw plans and specifications that are compliant with building codes, zoning codes, and other local ordinances. *Id.*; *see also Himmel Corp. v. Stade,* 367 N.E.2d 411, 415-15 (Ill. App. Ct. 1977) (acknowledging that architects and engineers who fail to prepare plans and specifications that are compliant with the applicable building codes may be sued for a breach of an implied contract).

Here, Environs' architect, Sapp, signed and stamped his seal on both structural and foundational drawings that were sent to the State for its approval. By signing and stamping his seal, Sapp became the design professional on the project and certified that Environs is responsible for the overall structural design of the building as the engineer of record. *See* IND. ADMIN. CODE 1.1-2-7(i). As previously discussed, the Contract required Environs to ensure that its design plans incorporated a way for the building to resist lateral loads. *See Greenhaven Corp.,* 463 N.E.2d at 285. At trial, several design drawings illustrating the structural and architectural layout of the Hotel were admitted as evidence. In particular, drawing sheet S1.1 depicted the interior wall design of a stair tower. (Ex. 170.) The interior design of the stair tower, according to S1.1, contained two dotted vertical lines, which represent steel rebar, that appear to be going through a portion of the concrete tower. (*Id.*) Additionally, the design called for the steel rebar to extend into the concrete tower a minimum of 32 inches; however, the design did not contain any labels showing that the rebar must extend throughout the entire length of the tower. (*Id.*) Environs submitted S1.1 to the State as well as to Nucon in April 2007. In addition to receiving S1.1, Nucon also received drawing sheet A4.11 which Sapp conceded at trial illustrated rebar and grout extending throughout the entire tower. (Ex. 173; Tr. 694:22-695:12.)

By submitting design drawings to the State and Nucon that were both incomplete and inconsistent, Environs failed to provide plans that were suitable for the purposes for which there

were prepared.  Instead of creating clarity as to the scope of Nucon's and DSI's involvement in designing shear wall panels, the design drawings created confusion.  The confusion was clearly evidence in several emails and request for information ("RFI") documents that were sent by Nucon and DSI to Environs.  At trial, McClain testified that, as the engineer of record, Environs was responsible for dispelling such confusion, but Environs did not affirmatively alleviate Nucon's and DSI's confusion relating to the design of the shear towers.  Given McClain's uncontradicted testimony, the Court concludes that Environs breached its duty of care to SAMS by not preparing plans that adequately provided for a lateral shear wall design that resisted lateral loads.

Furthermore, SAMS alleges that Environs failed to properly design the footings of the three concrete towers in its submitted designs to the State and, therefore, breached the Contract. McClain testified that given the size of the exterior structure of the Hotel, a mat footing – a large concrete pad with a top and bottom steel layer – would be the appropriate footing to use under each tower.  However, none of Environs' design drawings called for mat footings.  In addition to not including mat footings in its design, Environs' design drawings did not provide sufficient information regarding the installation of an extended foundation design.  In particular, a fourteen foot extended foundation, instead of the standard four foot foundation, design as needed on the north side of the building due to the discovery of underground pipes below the north stair tower. Despite having knowledge of these underground pipes, Environs did not modify its designs to address the change in excavation depth in its July 2007 or September 2007 design submittals to the State.  In short, by designing the concrete towers with insufficient footings and submitting incomplete design drawings with respect to extended foundations, Environs breached the Contract.

16

### 3.      Professional Standard of Care

SAMS also alleges that Environs breached the Contract by failing to carry out its duty as required by its profession when it acted as the design professional and engineer of record for the Hotel.  In its briefing to the Court, SAMS argues that Environs should have involved a structural engineer during the initial design phase as well as when issues arose regarding the adequacy of the lateral shear wall system and the foundation design.  (*See* Dkt. 188 at 18.)  SAMS asserts that Environs' failure to involve a structural engineer during these critical periods constituted conduct which fell below the professional standard of care of an architect.

"In a contract for work services, there is a duty to perform work skillfully, carefully, diligently, and in a workmanlike manner; failure to carry out that duty may constitute either a breach of contract or negligence."  *Farah, LLC v. Architura Corp.,* 952 N.E.2d 328, 336 (Ind. Ct. App. 2011) (quoting *INS Investigations Bureau, Inc., v. Lee,* 784 N.E.2d 566, 577-78 (Ind. Ct. App. 2003)).  Moreover, "an architect is bound to perform with reasonable care the obligations for which it contracted and is liable for failing to exercise professional skill and reasonable care in preparing plans and specifications according to its contract."  *See Strauss Veal Feeds, Inc. v. Mead and Hunt, Inc.,* 538 N.E.2d 299, 303 (Ind. Ct. App. 1989) (citing *Greenhaven Corp. v. Hutchcraft & Assocs., Inc.,* 463 N.E.2d 283, 286 (Ind. Ct. App. 1984)).

SAMS specifically argues that due to the complexity of designing a Class 1, Type 1 structure with an R1 occupancy, Environs' act of utilizing an architect, instead of a structural engineer, to design the building was below the standard of care.  Specifically, SAMS' expert witness, Steven Robinson ("Robinson"), opined that it was not good practice for an architect to design a Class 1, Type 1 structure without involving a structural engineer. (*See* Tr. 429:25-430:3.)  After reviewing the expert testimony and evidence admitted during trial, the Court finds

that Environs did not meet its duty as the engineer of record to use ordinary and reasonable care in designing the construction documents relating to the Hotel.

Here, Sapp, as the design professional, as bound to exercise reasonable are in preparing the design drawings and specifications in a workmanlike manner. *See Farah,* 952 N.E.2d at 336. In determining whether an architect performed his duties with a reasonable degree of care and skill as required by his profession, an architect's conduct is governed by the conduct ordinarily exercised by members of that profession. *See Strange v. Albert Kahn Assocs., Inc.*, 2005 WL 3488280, at *2 (Ky. Ct. App. Dec. 22, 2005) ("To determine whether the degree of care and skill exercised by a professional in a given case meets the standard of care, the act or failure to act is judged by the quality of professional conduct customarily provided by members of that profession."). However, the facts in this case are unique because Sapp also undertook responsibilities attributable to a structural engineer when he also became the engineer of record for the Hotel. Accordingly, Sapp was required to prepare his design drawings and specifications with the same professional level of care as a licensed engineer specializing in structural engineering. *See* Carl J. Circo, *When Specialty Designs Cause Building Disasters: Responsibility for Shared Architectural and Engineering Services*, 84 NEB. L. REV. 162, 181-82 (2005) ("[D]esign professional must exercise a professional level of care and diligence in performing all of the varied services they perform. A particular design services agreement may establish a more or less extensive scope of services, but each activity that calls for the application of professional expertise also imposes on the design professional a duty of professional care coextensive with the contractual responsibility involved.").

During trial, Robinson testified that by self-performing the structural engineering for the Hotel as the engineer of record, Environs failed to meet the professional standard of care.

Robinson explained that the design of a Class 1, Type 1 structure involves serious design considerations warranting the involvement of a licensed, professional engineer. Robinson further testified that it was not good practice for an architect without a professional engineering license to design that type of structure. The Court finds that Robinson's testimony is uncontradicted. *See Thusis v. E.G. Hintz and Sons, Inc.,* 2006 WL 2806407, at *3 (Wis. Ct. App. Oct 3, 2006) (articulating that expert testimony relating to the appropriate standard of care was essential in determining the appropriate standard of care for an architect in a negligence action); *Nelson v. Virginia*, 368 S.E.2d 239, 243 (Va. 1988) ("[T]he practice of architecture is sufficiently technical to require expert testimony to establish the standard of care and any departure therefrom."). Even though Environs' architect could technically serve as an engineer of record under Indiana law, an architect may not undertake work he is not qualified to perform.[14] Environs' lead architect in the project, Sapp, was not a licensed engineer who specialized in structural engineering. Furthermore, Sapp's college courses dealing with structural engineering as well as his previous work experience were not sufficient to provide him with the training and knowledge to adequately design the Hotel.

Moreover, Robinson testified that an architect exercising the professional standard of care would obtain support from other professionals with different areas of expertise when special issues arose. (See Ex. 147 at 4.) However, at critical stages of the Hotel's design process when Environs became aware of major structural problems, Environs did not involve a structural engineer. In September 2007, Environs became aware of serious problems associated with the designs of the lateral shear wall system through an RFI document, but it decided not to involve a structural engineer. Specifically, the substance of the RFI document related to whether Nucon or

---

[14] "A registrant shall undertake to perform professional services only when he, together with those whom the architect or landscape architect may engage as consultants, is qualified by education, training, and experience in the specific technical areas involved." 804 IND. ADMIN. CODE 1.1-4-2(c).

Environs was responsible for providing a lateral shear wall system. Thus, at this time, it became

evident that neither company knew that they had provided an adequate shear load design for the

building.  However, despite the confusion between both Nucon and Environs, Environs decided

not to involve a structural engineer. Even when Environs continued to receive emails from

Nucon and DSI concerning questions over the approval of certain calculations relating to the

lateral shear loads, Environs refrained from involving a structural engineer at that time.

Robinson stated that pursuant to the professional standard of care, the engineer of record would

be required to resolve the confusion. Moreover, McClain testified that, as the engineer of record,

it was Sapp's responsibility according to the administrative rules to resolve the confusion

between Environs, Nucon, and DSI. (Tr. 514:25-515:5.)  In the case at hand, the questions

involving the design of the lateral shear loads would have been identified and resolved by a

structural engineer. Accordingly, the Court concludes that Environs' reluctance to involve a

structural engineer at the initial stage of the design process, when it was responsible for the

overall structural design of the building, was below the professional standard of care.  Therefore,

the Court finds that Environs failed to provide its architectural services in a workmanlike

manner; and as a result, its actions constituted a breach of the Contract.

> **4.      Inspection Obligation of Environs**

Lastly, SAMS alleges that Environs' failure to inspect the construction site or designate a

structural engineer to conduct the inspection at the appropriate times amounted to a breach of the

Contract.   Under the construction administration phase section of the Contract, it states in

relevant part the following:

> Provide a total of three (3) visits to the site of work during construction to become
> familiar with the general progress of work in accordance with the Construction
> Documents.  Submit written reports of findings of site visits to the Owner after

each visit. (Travel costs for site visits shall be submitted as a reimbursable expense.)

(Ex. 1 at 3, ¶ IV (c), [hereinafter, "Part (c)"]). Given the contractual provision cited above, SAMS alleges that Environs failed to inspect the Hotel during the appropriate times, when it was responsible for the overall design of the building; therefore, its inaction constituted a breach of the Contract.

In the Court's view, SAMS did not meaningfully develop this argument. Regardless, SAMS seems to imply that a breach occurred with respect to Part (c) in one of two ways: (1) Environs did not inspect the construction site at the appropriate times, or (2) Environs' inspection was inadequate.  Indiana courts, in reviewing similar contractual provisions, have held that absent special agreements relating to inspection obligations, architects are not insurers of a contractor's work.  *See Mayberry Café, Inc. v. Glenmark Constr. Co.,* 879 N.E.2d 1162, 1174 (Ind. Ct. App. 2008) (finding that an architect was not liable for failing to adequately inspect and supervise a construction project because contract language did not imply that the architect would be the insurer of the contractor's work); *Farah, LLC v. Architura Corp.,* 952 N.E.2d 328, 337 (Ind. Ct. App. 2011) (finding that the architect did not breach the contract with respect to its inspection obligations in the absence of a special agreement outlining its requirements).

Like in *Farah* and *Mayberry*, the Contract did not adequately set forth specific requirements for Environs relating to the time or manner in which it should inspect the construction site.  Importantly, the evidence establishes that Environs visited the construction site on March 18, 2008, in an effort to become familiar with the general progress of the work, as a result of an inquiry about the construction site initiated by a third party.  The fact that Environs did not visit the construction site before March 18, 2008 is not an issue with respect to Part (c) of the Contract because the Contract's language did not set forth particular requirements associated

21

with the adequacy of the inspections. Accordingly, the Court concludes that Environs did not breach the Contract with respect to its inspection obligations. Even assuming *arguendo* that Environs breached its contractual obligations, the Court finds that any such breach did not result in damages to SAMS.

## C.   Causation

Finally, Environs contends that even if it breached the Contract, its breach was not a substantial factor in causing SAMS' damages; therefore, an award of damages is not warranted. To bolster its argument, Environs asserts that the ACBD's order to demolish the Hotel was due to construction defects in the concrete towers and foundation caused by the general contractor and/or subcontractors, and not due to the plans and specifications designed by Environs. The Court is not persuaded.

In order to recover on a breach of contract claim, the alleged breach must be a cause in fact of the plaintiff's loss. *Fowler*, 612 N.E.2d at 602. In establishing that the alleged breach was the cause in fact of his injury, plaintiff must show that the breach was a substantial factor in bringing about plaintiff's damages. Id. (citing *Krauss v. Greenbarg*, 137 F.2d 569, 572 (Ind. Ct. App. 1943)). "The test of causation in common law contract actions is not whether the breach was the only cause, or whether other causes may have contributed, but whether the breach was a substantial factor in bringing about the harm." *Id.; cf. Parke State Bank v. Akers*, 659 N.E.2d 1031, 1035 (Ind. 1995) (stating that Indiana does not recognize comparative causation in breach of contract cases).

SAMS argues that Environs' conduct resulting in a breach of the Contract was a substantial factor in causing its damages. Environs attempts to refute SAMS' claim by arguing that the actual reason for the demolition of the Hotel was due to the foundational issues related to

the loose soil under the building site.  In support of its argument, Environs offered testimony from its expert witness, Norman, testifying that the poor soil conditions underneath the north tower led to the settling of the overall structure.  After reviewing Norman's testimony, the Court finds that much of his testimony relates to the design of the Hotel as well as comparative causation – two issues that the Court expressly prohibited him from testifying about in the Court's order on motions to exclude experts. ( See Dkt. 143 at 3-6.)  However, the Court need not address this issue in more detail because the Court finds the testimony from SAMS' witnesses, such as McClain and Robinson, were more credible than Environs' witnesses, including Norman.

Here, the ACBD ordered the Hotel to be demolished in March 2009 due to its concern that the building was settling rapidly and the north tower was in imminent danger of collapse. (See Ex. 143 at 14; Tr. 31:5-11.)  Before submitting an order to SAMS to demolish the Hotel, the ACBD relied upon the documented findings of McClain's investigation of the construction site. McClain testified that based on his investigation, the lack of a shear design incorporated within the three concrete towers coupled with the lack of mat footings underneath the stair towers was a reason for the building coming down.  (Tr. 547:25-548:3; Ex. 136 at 1.)  McClain's findings were based upon his observations of significant movement in the two of three towers – specifically, the north and elevator towers.  (See Ex. 136 at 1.)

Given McClain's testimony and findings from his investigation, it is more likely than not that Environs' inadequate design of the Hotel's concrete towers and foundational footings was a substantial factor in causing ACBD's order to demolish the Hotel.  See *Collins v. Am. Optometric Ass'n,* 693 F.2d 636, 640 (7th Cir. 1982) (applying Indiana law) ("[Plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than

23

not that the defendant's conduct was a substantial factor in bringing about the injury complained of."). Importantly, Environs' own expert, Norman, testified that he concluded that the north concrete tower was leaning significantly off center. (Tr. 743:13-15.) Under these circumstances, SAMS has presented sufficient evidence to establish that the order to demolish Homewood Suites would not have occurred but for the conduct of Environs in preparing its designs inadequately. Accordingly, the Court finds that Environs' actions resulting in the inadequate design of Hotel's shear towers and foundation footing were substantial factors in causing the demolition of Hotel.

**D.     Damages**

In the Court's Entry on Cross Motions for Summary Judgment (Dkt. 141), the Court held that the limitation of liability clause in the Contract is valid and enforceable. As a result, SAMS' total liability to Environs shall not exceed the total lump sum amount as outlined under the Contract.

The Contract between SAMS and Environs contains the following provision:

> The Owner agrees that to the fullest extent permitted by law, Environ Architect/Planners, Inc. total liability to the Owner shall not exceed the amount of the total lump sum fee due to the negligence, errors, omissions, strict liability, breach of contract or breach of warranty.

The lump sum due under the Contract was $70,000.00.

In its prior entry (Dkt. 141 at 7, "the Prior Entry"), the Court incorrectly concluded that Environs' liability to SAMS would be limited to the lump sum fee *paid* by Environs. The Court now amends the Prior Entry to accurately reflect the terms of the February 22, 2007 signed letter agreement, to-wit: "Defendant's liability to Plaintiff is limited to the lump sum fee *due* to Plaintiff."

As a result, Environs' total liability to SAMS is limited to $70,000.00.

## III. CONCLUSION

For the reasons set forth herein, the Court finds that Environs breached the Contract, and its breach was a substantial factor in causing SAMS' damages.  Accordingly, SAMS is entitled to judgment against Environs in the amount of $70,000.00.

SO ORDERED.

Date: 08/01/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael Paul Bishop
COHEN GARELICK & GLAZIER
Mbishop@cgglawfirm.com

John Michael Bowman
PLEWS SHADLEY RACHER & BRAUN
mbowman@psrb.com

Colin Edington Connor
PLEWS SHADLEY RACHER & BRAUN
cconnor@psrb.com

Frederick D. Emhardt
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com

M. Edward Krause III
COHEN GARELICK & GLAZIER
ekrause@cgglawfirm.com

Donna C. Marron
PLEWS SHADLEY RACHER & BRAUN
dmarron@psrb.com

Brett E. Nelson
PLEWS SHADLEY RACHER & BRAUN
bnelson@psrb.com

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com